UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FIRST STUDENT, INC., Plaintiff, | ) | |
| | ) | C.A. No. 06-207-T |
| v. | ) | |
| AMALGAMATED TRANSIT UNION, DIVISION 618, Defendant. | ) | |

**PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD**

Pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, plaintiff hereby moves to vacate the enclosed arbitration award.

In support of this motion, the Court is respectfully referred to the accompanying memorandum and exhibits.

FIRST STUDENT, INC.

By its Attorneys,

/s/ Mark A. Pogue

Mark A. Pogue (#3441)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
401-274-9200
401-276-6611 Telecopy

**Certificate of Service**

I hereby certify that on the 16th day of March, 2007 a true copy of the foregoing Plaintiff's Motion To Vacate Arbitration Award was served upon counsel of record listed below through the ECF system.

Carly B. Iafrate, Esq.
129 Dyer Street
Providence, RI 02903

Gerard P. Cobleigh, Esq.
70 Jefferson Boulevard
Warwick, RI 02888

/s/ Mark A. Pogue

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FIRST STUDENT, INC., Plaintiff, | ) | |
| v. | ) | C.A. No. 06-207-T |
| AMALGAMATED TRANSIT UNION, DIVISION 618, Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION TO VACATE ARBITRATION AWARD**

Plaintiff First Student, Inc. ("First Student") submits this memorandum in support of its motion to vacate an arbitration award made on February 6, 2006 in favor of the defendant, Amalgamated Transit Union, Division 618 (the "ATU"). In the award, the arbitrator concluded that First Student terminated the employment of ATU member Deborah Sanville ("Sanville"), a school bus driver, without just cause – even though Sanville appeared at work on a scheduled work day with a blood alcohol level in excess of permissible limits. The arbitrator ordered First Student to reinstate Sanville with back pay and benefits.

As shown below, the arbitrator exceeded his power in rendering the award, and he manifestly disregarded the federal regulations governing First Student's obligation to subject its bus drivers to alcohol testing in certain situations. Moreover, the award violates the strong public policy of the State of Rhode Island to prevent drunk driving. For all of these reasons, the award does not draw its essence from the parties' collective bargaining agreement, and should therefore be vacated.

**Factual Background**

Except as otherwise noted, the following facts are undisputed.

**A. The Parties**

First Student provides school bus transportation for students in various communities. In particular, First Student has a facility in Warwick, Rhode Island from which it provides school bus service for students in Warwick.

The school bus drivers employed by First Student are members of a bargaining unit represented by the ATU. As of 2004, Sanville was a member of the ATU, and was employed by First Student as a driver in the Warwick school system.

**B. Applicable Regulations And The Collective Bargaining Agreement**

Because it is in the business of transporting passengers, First Student and its employees are subject to a variety of United States Department of Transportation regulations. In particular, First Student's drivers are subject to 49 C.F.R. §382.307, entitled "Reasonable suspicion testing," which states in applicable part as follows:

> (a) An employer shall require a driver to submit to an alcohol test when the employer has reasonable suspicion to believe that the driver has violated the prohibitions of subpart B of this part concerning alcohol. The employer's determination that reasonable suspicion exists to require the driver to undergo an alcohol test must be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver.
>
> * * *
>
> (d) Alcohol testing is authorized by this section if the observations required by paragraph (a) of this section are made during, just preceding, or just after the period of the work day that the driver is required to be in compliance with this part. A driver may be directed by the employer to only undergo reasonable suspicion testing while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has ceased performing such functions. (Emphasis added.)



PRV_868349_1/MPOGUE

The "prohibitions of subpart B" referred to in this regulation refer to the permissible blood alcohol limit specified in the federal regulations for drivers performing safety-sensitive functions. That permissible limit is 0.04. 49 C.F.R. §382.201.

In 2004, the parties entered into a collective bargaining agreement (the "CBA") which covers the period July 1, 2004 through June 30, 2008. A copy of the CBA is attached hereto as Exhibit A. Article 22 of the CBA provides as follows:

> An employee shall only be required to submit to a drug and/or alcohol test on a day during which they are scheduled or assigned to perform work.

Exh. A, p. 10.

Thus, both the applicable federal regulations and the CBA impose limits on when First Student may require an employee to submit to alcohol testing. Under 49 C.F.R. §382.307(d), such testing may only occur during, just after, or "just before the driver is to perform safety-sensitive functions." Under the CBA, the employer may require such testing only on a day when the driver is "scheduled or assigned" to perform work.

The CBA contains a grievance procedure intended to resolve any disputes between ATU members and First Student. The procedure culminates in binding arbitration. The CBA makes clear that, in resolving disputes that reach arbitration, the arbitrator may not add to the terms of the CBA:

> The power of the arbitrator shall be limited to the interpretation of the Agreement. He shall have no power to add or subtract from or modify any of this Agreement ...

Exh. A, p. 8.

**C. The Events Of December 1, 2004**

On December 1, 2004, Sanville was scheduled to drive three runs from First Student's Warwick facility. See Exh. B, p. 7. These included an AM run, which leaves the yard about 7:00 am; a midday, or kindergarten run, which departs at about 11:00 am; and a PM run, which is in the afternoon. Because driving a school bus is a safety-sensitive function, Sanville was not permitted to have an alcohol concentration greater than 0.04 during, just before, or just after any of these three runs.

There is no dispute that Sanville failed to appear for her scheduled morning run. See Answer, ¶ 7. Further, there is no dispute that, in violation of company policy, Sanville failed to call in to work to inform the dispatcher that she would not be covering her scheduled morning run. Exh. B, p. 7; Answer, ¶ 7.

At the arbitration hearing, the parties disputed what happened after Sanville failed to appear for her morning run. According to Sanville, First Student's dispatcher, Lynn Hopkins ("Hopkins"), called her at home on two occasions and on each occasion Sanville told Hopkins that she would not be coming in to drive. Exh. B, p. 8. Sanville testified that Hopkins called her a third time, at about 10:15, and directed her to report to the yard because the company's safety coordinator, Ann Wilson, wanted to see her. Id.

In contrast, Hopkins testified that, the first time she called Sanville's home, she got no answer. Exh. B, p. 10. On the second occasion, Sanville told Hopkins that she would indeed be in to cover her midday run. Id. In reliance on that statement, Hopkins did not make arrangements to have Sanville's midday run covered by another driver. Id. Consistent with Hopkins' version of events, Wilson testified that Hopkins told her that Sanville would be coming in for her midday and afternoon runs. Id., p. 7.

Sanville drove to work and arrived about 10:45 am. According to Sanville, as she walked in the door of the office on the way to Wilson's office, she repeated to Hopkins that she was not there to do her midday run. Exh. B, p. 9. Sanville testified that she then went in to see Wilson, who gave her a verbal warning for failing to call in sick on a day she was scheduled to drive. Id. A verbal altercation ensued, after which Wilson, in the presence of assistant location manager John Brown ("Brown"), directed Sanville to submit to alcohol testing. Id.

In contrast, Hopkins had no recollection of Sanville's announcing to her, when she arrived at the yard at about 10:45 am, that she was not there to drive. Exh., p. 11. Wilson testified that, during the meeting at which she delivered the verbal warning, Sanville's face was flushed, here eyes were bloodshot, and she had an odor of alcohol. Id., p. 8. Wilson had been trained to recognize the effects of alcohol. Id. After conferring with Brown, Wilson directed Sanville to submit to alcohol testing. Id.

The parties do not dispute that Sanville thereupon submitted to the alcohol test and that her results exceeded the federal limit of 0.04. Exh. A, p. 11. By letter dated December 6, 2004, First Student terminated Sanville's employment on the basis of these test results.

**D. The Arbitration Award**

Sanville grieved her dismissal. A hearing was held on November 21, 2005. On February 6, 2006, the arbitrator issued an award directing that Sanville be reinstated.

On the factual question of whether Sanville told Hopkins that she was coming to the yard to work on December 1, 2004, the arbitrator resolved the conflicting evidence in favor of Sanville. According to the arbitrator, "Sanville did not come [to the yard] for the purpose of driving a Company vehicle. She never got into her assigned vehicle, and she had no intention of driving children that day." Exh. B, p. 15.

Having found that Sanville did not intend to drive on the day in question, the arbitrator went on to invent and then add an "intent to drive" requirement to the testing limitations contained in Article 22 of the CBA. On the basis of this newly created "intent to drive" requirement, the arbitrator concluded that First Student's testing of Sanville was not permitted:

> Since Sanville never <u>intended</u> to drive on December 1, she was not "scheduled or assigned," as that phrase is used in Article 22. The Company therefore did not have the right to have her submit to reasonable suspicion testing.

Exh. B, p. 17 (emphasis added).

In rendering his award, the arbitrator focused solely on whether the reasonable suspicion testing given to Sanville was permissible under the CBA. Although the arbitrator expressly noted the federal regulations governing reasonable suspicion testing, he completely ignored those regulations in rendering his award.

## Argument

The award should be vacated for several reasons. First, the arbitrator exceeded his powers because he added an "intent to drive" requirement to the limitations on First Student's ability to subject its employees to alcohol testing. Second, the arbitrator noted, but then manifestly disregarded, the federal regulations which govern First Student's obligation to subject its employees to alcohol testing. Those regulations not only permitted the testing on Sanville, but required it. Third, the award violates the strong public policy of the State of Rhode Island to discourage drunk driving.

For all of these reasons, the award does not draw its essence from the bargaining agreement executed by the parties, and should therefore be vacated.

## I. Judicial Review Of Arbitration Awards – General Principles

The Federal Arbitration Act, 9 U.S.C. §1 et seq., authorizes the federal courts to vacate arbitration awards in certain situations. In particular, that act authorizes courts to vacate awards "where the arbitrators exceeded their powers..." Id. at §10(a)(4).

In addition, the federal courts have themselves identified grounds for which an arbitration award must be vacated. One such ground is that the award fails to draw its essence from the parties' collective bargaining agreement. As the United States Supreme Court has stated:

> As the proctor of the bargain, the arbitrator's task is to effectuate the intent of the parties. His source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement in accordance with the industrial common law of the shop and the various needs and desires of the parties.
>
> * * *
>
> An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.

Alexander v. Gardner-Denver Company, 415 U.S. 36, 94 S.Ct. 1011, 1022 (1974), quoting United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960) (quotation marks omitted).

The Tenth Circuit Court of Appeals recently elaborated on the requirement that an arbitration award "draw its essence" from the collective-bargaining agreement:

> [A]n arbitrator's discretion, though entitled to profound deference, is not unlimited...[A]n award does not draw its essence from the [collective bargaining agreement] if it is contrary to the express language of the contract or is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator or if

> viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support.

LB & B Associates, Inc. v. International Brotherhood of Electrical Workers, Local No. 113, 461 F.3d 1195, 1197-98 (2006) (citations and quotation marks omitted).

**II. The Award Should Be Vacated Because The Arbitrator Exceeded His Powers**

"The court cannot enforce arbitration awards that do not draw their essence from the collective bargaining agreement. The courts vacate such awards as outside of the power of the arbitrator." S.D. Warren company v. United Paperworkers' International Union, AFL-CIO, Local 1069, 815 F.2d 178, 186 (1st Cir. 1987) (citation omitted)..

Here, the CBA in question clearly prohibited the arbitrator from adding to or modifying the parties' agreement. Exh. A, p. 8. But the arbitrator did just that. The arbitrator invented, and then applied, an "intent to drive" limitation on First Student's ability to test: according to the arbitrator, First Student can only test when an employee "intends to drive." While this "intent to drive" limitation may have appealed to the arbitrator's sense of fairness, it is nowhere found in the parties' agreement. The CBA (consistent with the applicable federal regulations) only limits First Student's ability to test to days when the employee is "scheduled or assigned to perform work." Id., p. 10. By adding this "intent to drive" limitation to the parties' agreement, the arbitrator clearly exceeded his powers in violation of section 10(a)(4) of the Federal Arbitration Act.

The same conclusion obtains under the common law. If an arbitrator issues an award based on a modification or addition to the parties' collective bargaining agreement, that award does not "draw its essence" from the parties' agreement, and is therefore void. For example, in Mountaineer Gas Company v. Oil, Chemical & Atomic Workers International Union, 76 F.3d 606, (4th Cir. 1996), the Fourth Circuit Court of Appeals considered a collective bargaining

agreement that – like the instant CBA – prohibited the arbitrator from amending, adding to, or subtracting from the agreement. Id. at 608. The agreement in Mountaineer provided that employees working in safety sensitive positions would be promptly discharged if they failed a drug test. When an employee named Watson failed such a test, he was dismissed. But he grieved his dismissal and the arbitrator, noting Waton's "unblemished work history over 15 years," issued an award which converted Watson's dismissal into a disciplinary suspension. Id. at 609.

The district court vacated the award and, on appeal, the Fourth Circuit affirmed. The appeals court noted that, by inventing a sanction that did not appear in the parties' agreement, the arbitrator exceeded his powers, with the result that the award did not draw its essence from the parties' agreement:

> The arbitrator's role clearly prohibited him from amending, adding to, or subtracting from the CBA. Therefore, by converting Watson's permanent discharge into a disciplinary suspension, the arbitrator did not do his job....By fashioning an entire new remedy... the arbitrator created an award that failed to draw it essence from the CBA[.]

76 F.3d at 611.

To the same effect is S.D. Warren Company v. United Paperworkers' International Union, AFL-CIO, Local 1069, 815 F.2d 178 (1st Cir. 1987). There, the employer discharged several employees for violating its drug policy. The matter went to arbitration, where the arbitrator converted the discharges to suspensions – even though the bargaining agreement did not authorize this as a remedy. The First Circuit vacated the award because the arbitrator's creation of this unbargained-for clause exceeded his powers:

> Under these circumstances, the imposition by the arbitrator of a punishment the parties did not bargain for does not draw its essence from the collective bargaining agreement and such a Construction is not the one the parties bargained for.

Id. at 186-87.

Here, the arbitrator imposed an "intent to drive" limitation on First Student's drug testing program that was not bargained-for. The award therefore does not draw its essence from the CBA.[1]

**III. The Award Should Be Vacated Because The Arbitrator Manifestly Disregarded The Law**

Another reason why the award should be vacated is because the arbitrator manifestly disregarded the federal regulations governing alcohol testing. "Courts should vacate an arbitration award...when the award was made in manifest disregard of the law." Airline Pilots Ass'n, Intern. V. Pan American Airways Group, 405 F.3d 25, 30 (1st Cir. 2005), citing JCI Communications v. Int'l Bd. Of Elec. Workers, 324 F.3d 42, 48 (1st Cir. 2003).

As noted above, federal regulations require covered employers to subject drivers to "reasonable suspicion" testing if the observations giving rise to the suspicion are made "during, just preceding, or just after" the period of the work day in which the driver is to perform safety-sensitive functions. See supra at 2; 49 C.F.R. §382.307. In this case, Wilson's observations giving rise to her suspicion that Sanville had been drinking occurred shortly after Sanville had been scheduled to perform her AM run, and just before she was to perform her midday run. Wilson was therefore required to administer the test.

[1] Note that inventing and imposing the "intent to drive" requirement was the only way to invalidate First Student's testing of Sanville. The testing was otherwise perfectly lawful, because Sanville was "scheduled or assigned to work" on the day she was tested, in conformance with the CBA, and she was tested "just before" or "just after" she was scheduled to perform safety-sensitive functions, in conformance with federal regulations.

The arbitrator noted the existence of the federal regulations governing alcohol testing in his award. But he utterly failed to apply those regulations. Had he done so, he could not have avoided the conclusion that First Student's testing of Sanville was compelled by federal law.

Because the arbitrator manifestly disregarded the federal regulations governing alcohol testing, the award should be vacated.

## IV. The Award Should Be Vacated Because It Violates Public Policy

As the First Circuit has noted, "a court may vacate an award that violates public policy." Mercy Hospital, Inc. v. Massachusetts Nurses Association, 429 F.3d 338, 343 (1st Cir. 2005) (citation omitted). Whether an award violates public policy must be examined closely. The mere fact that "general considerations of supposed public interests" might be offended by an arbitral award is not enough to warrant discarding it. Id., quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983). Rather, "the award must violate an 'explicit... well defined and dominant' public policy, as ascertained by reference to ... laws and legal precedents.'" Mercy Hospital, Inc., 429 F.3d at 343, quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (citations and internal quotation marks omitted).

Here, the arbitrator's order directing First Student to rehire a school bus driver who failed an alcohol test on a day she was scheduled to drive violated two "explicit, well defined and dominant" public policies in Rhode Island: the policy against drunk driving, and the policy requiring school bus operators to be safe drivers. For that reason also, the award should be vacated.

### A. Rhode Island's Policy Against Drunk Driving

There is no question that Rhode Island has an explicit and well-defined policy against drunk driving. As our state Supreme Court has stated:

> There is no doubt that the clear public policy of our nation and this state is to prevent individuals form driving while intoxicated. preventing the future loss o innocent lives because of intoxicated drivers requires both legislative and judicial action in a combined effort to win the war against the devastating consequences of drunk driving.

Ferreira v. Strack, 652 A.2d 965, 970 (R.I. 1995); accord, Martin v. Marciano, 871 A.2d 911, 916 (R.I. 2005) (noting Rhode Island's "clear public policy against drunk driving.").

The law books in Rhode Island are filled with legislative efforts to promote this policy. See R.I. Gen. Laws §31-27-2 (outlawing driving while intoxicated); §37-27-2.1 (permitting law enforcement officers to administer chemical tests on drivers to test for the presence of intoxicating liquor, and prescribing penalties for refusal to comply with such tests); §31-27-2.2 (prescribing penalties for driving under the influence of alcohol, death resulting); §31-27-2.6 (prescribing penalties for driving under the influence of alcohol resulting in serious bodily injury).

**B. Rhode Island's Policy Concerning School Bus Drivers**

Rhode Island also has an explicit, well defined and dominant policy requiring school bus drivers to be safe operators. School bus drivers, unlike other operators of motor vehicles, must obtain not only a chauffeur's license, but also a special certificate, before they can transport school children in a bus. R.I. Gen. Laws §31-10-5. They cannot obtain a chauffeur's license unless they have submitted character references; taken special school bus training; and passed written and road tests. Id. at §31-10-5(b). Applicants may not obtain such a license if they have violated "any safety regulation." Id. Once licensed to operate school busses, drivers apply to

renew their license each year, and must complete a three (3) hour retraining class each year. Id. at §31-10-5.1.[2]

**C. The Reinstatement Order Violates Public Policy**

Against this background, it is clear that the arbitrator's reinstatement order offends public policy. Handing the keys of a school bus to a bus driver who was intoxicated on a scheduled work day is precisely what Rhode Island's policies are intended to prevent. The reinstatement order therefore violates public policy for that reason alone. Moreover, even though "an employer is not invariably required to point to a specific provision of positive law in order to bring a case within the ambit of the public policy exception," Mercy Hospital v. Massachusetts Nurses Association, supra at 345, in this case First Student can point to such a provision. In particular, Rhode Island law prohibits any person who has violated "any safety violation" from obtaining a school bus driver certificate. See R.I. Gen. Laws s31-10-5(c). Here, there is no dispute that Sanville's blood alcohol concentration exceeded the limits specified in the federal regulations (49 C.F.R. §382.307) "just before" she was scheduled to drive. She therefore violated a safety regulation and is ineligible under R.I. Gen. Laws §31-20-5(c) to renew her school bus driver certificate. The arbitrator's reinstatement order flies in the face of that provision, and for that reason also contravenes Rhode Island's public policy. Cf. Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1295 (3rd Cir. 1996) ("reinstatement of an employee who refused to submit to a drug test upon reasonable cause violates public policy.")

[2] Complementing Rhode Island's elaborate set of rules intended to ensure safe drivers of school busses are special laws intended to promote the safety of busses and children on the roads. See, e.g., R.I. Gen. Laws §31-20-12 (requiring motor vehicles approaching from any direction to stop when school bus lights are flashing).

## Conclusion

For the foregoing reasons, First Student's Motion To Vacate Arbitration Award should be granted.

FIRST STUDENT, INC.

By its Attorneys,

/s/ Mark A. Pogue

Mark A. Pogue (#3441)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
401-274-9200
401-276-6611 Telecopy

**Certificate of Service**

I hereby certify that on the 16th day of March, 2007 a true copy of the foregoing Memorandum In Support of Plaintiff's Motion To Vacate Arbitration Award was served upon counsel of record listed below through the ECF system.

Carly B. Iafrate, Esq.
129 Dyer Street
Providence, RI 02903

Gerard P. Cobleigh, Esq.
70 Jefferson Boulevard
Warwick, RI 02888

/s/ Mark A. Pogue