# EXHIBIT B

# American Arbitration Association

## VOLUNTARY LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

AMALGAMATED TRANSIT UNION,
DIVISION 618

and

FIRST STUDENT, INC./ WARWICK, RHODE ISLAND

AAA Case No. 11 300 00675 05

**AWARD OF ARBITRATOR**

The grievant, Donna Sanville, was terminated without just cause. She shall be retroactively reinstated with full back pay, less interim earnings; seniority; and benefits. The Arbitrator will retain jurisdiction for the sole purpose of resolving any dispute as to the implementation of this remedy.

Mark L. Irvings

Mark L. Irvings
February 6, 2006

EXHIBIT
B

In the Matter of the Arbitration between

AMALGAMATED TRANSIT UNION,
DIVISION 618

and

FIRST STUDENT, INC./ WARWICK, RHODE ISLAND

OPINION
AND
AWARD

AAA Case No. 11 300 00675 05

The parties submitted this case to arbitration pursuant to their collective bargaining agreement effective July 1, 2004 to June 30, 2008. A hearing was held on November 21, 2005. Gerard P. Cobleigh, Esq., appeared on behalf of the Union; and Audrey Adams, Esq., appeared on behalf of the Company. Post-hearing briefs were received from the parties by January 20, 2006.

## ISSUE

> Was the grievant, Donna Sanville, terminated for just cause? If not, what shall be the remedy?

## BACKGROUND

**Warwick Operations.** The Company has a facility in Warwick, Rhode Island, from which it provides school bus service to the local community. In December 2004, the location manager was Patricia Boyle, the assistant location manager was John Brown, the safety coordinator was Ann Wilson, and the dispatcher was Lynn Hopkins. These managers worked out of a trailer which had an outer and an inner office. Warwick was one of the locations in Rhode Island and eastern Connecticut which was overseen by Regional Operations Manager Joe Petrozak.

The drivers in Warwick have since 2001 been included in a bargaining unit represented by the ATU, Division 618. Among the provisions in the collective bargaining agreement is Article 2 Management Rights, which states:

> The Union recognizes the right and responsibility of the Company to manage its facility and to direct its working forces. All rights of the company which have not been specifically abridged or modified by this Agreement are retained by the Company including, but not limited to, the right to make and modify reasonable work rules and regulations. The Company agrees to notify the Union by registered mail prior to the implementation of changes in rules and regulations.

Article 7 Seniority provides, among other things, that an employee will lose seniority rights "[i]f he/she is discharged for just cause."

Prior to each school year, drivers bid by seniority for available routes. For many drivers those routes include an AM run, which leaves the yard about 7:00 am; a midday, or kindergarten run, which departs at about 11:00 am; and a PM run, which is in the afternoon. Drivers are scheduled and expected to perform their bid route everyday. If for some reason they will not be able to cover their routes, drivers are required to call the dispatcher ahead of time, so the dispatcher can arrange coverage.

When they come to the yard, many drivers go directly to their assigned buses, since they may have a set of keys for the vehicle. If they do not have their own set, the drivers must go to the dispatcher's area and retrieve a set of keys off a board. Drivers are given fifteen minutes to conduct a pre-trip check, which can only be performed if they have the ignition key. The dispatcher can communicate with drivers either over the two-way radio installed in the vehicle, and which only works when the ignition is on, or by calling on the driver's cell phone.

In December, 2004, the Company did not have a time clock at which employees would punch in and out. Time cards were kept for each employee, on which someone would put either an X or a check in the AM, noon, and PM route boxes for each day of the week. There was no testimony as to who actually made the notations. Someone would also enter the hours allotted for each run. At the end of the week, the drivers are supposed to sign their time card, attesting that the information is accurate.

**Drug and Alcohol Policies.** Because it is in the business of transporting passengers, the Company and its employees are subject to a variety of United States Department of Transportation regulations, including 49 C.F.R. §382.307 Reasonable Suspicion Testing, which mandates in relevant part:

> (a) An employer shall require a driver to submit to an alcohol test when the employer has reasonable suspicion to believe that the driver has violated the prohibitions of subpart B of this part concerning alcohol. The employer's determination that reasonable suspicion exists to require the driver to undergo an alcohol test must be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech or body odors of the driver.

Under the regulations, a blood alcohol concentration of 0.02 is deemed to be a positive. Other than prohibiting a person from driving until a subsequent test yields a reading of less than 0.02, the regulations do not dictate what disciplinary actions should or may be taken against the driver.

The only mention of testing in the parties' collective bargaining agreement is in Article 22 Drug Testing, which states:

> The Company shall pay an employee required to have a drug and/or alcohol test one (1) hour's pay at the employee's regular rate of pay, but only if the employee tests negative.

> An employee shall only be required to submit to a drug and/or alcohol test on a day during which they are scheduled or assigned to perform work.

In years prior to 2004, the Company issued national and regional employee handbooks to employees at the pre-school year meeting. Because negotiations for the 2004-2008 collective bargaining agreement stretched into the fall, however, no handbooks were distributed in 2004. At the arbitration, there was some confusion regarding different versions of policy manuals. Petrozak identified the document dated October 14, 2002 as the most recent iteration of the Company's drug and alcohol policy. That document read, in relevant part:

> **Policy Statement**
> . . . the company has adopted this policy that is designed to:
>
> 1. create a work environment free from the adverse effects of drug abuse and alcohol misuse;
>
> . . .
>
> 5. comply with the requirements to implement a controlled substances and alcohol testing program as mandated by the Department of Transportation Regulations, 49 CFR Parts 382 and 40.
>
> Each location should post in a conspicuous place the "Drug and Alcohol Use" statement located at the end of this policy.
>
> **Purpose**
> . . . First Student maintains a **zero tolerance** program and holds all employees accountable for their conduct.
>
> • The use . . . of . . . alcohol on First Student premises, in First Student vehicles, or while conducting business-related activities off First Student premises, is prohibited and considered a willful violation of company policy which may result in termination of employment.
>
> • Employees have the responsibility to report to work and be at work in a fit condition to perform their jobs

without unnecessary risk to themselves or other individuals. Failure to do so may result in termination of employment.

- Having a verified positive drug test or alcohol test with an alcohol concentration equal to or greater than .02, or refusing to take a test required under this policy, is considered a willful violation of company policy that may result in termination of employment.

**Testing for the Presence of Alcohol**
The Company reserves the right to test **all** employees for the presence of alcohol under the following guidelines:

- Reasonable Suspicion: whenever the employee's performance, attendance, conduct, appearance, speech, or behavior on the job creates a reasonable question of whether the employee is under the influence of alcohol.

**DOT Alcohol Testing for Drivers/Technicians**
. . .
Alcohol testing shall be conducted under the following circumstances:

. . .
- Reasonable Suspicion . . .

. . .
- Follow-up testing. (382.11). While employees who violate the terms of this policy may be terminated from employment with the company, any employee who returns to duty will be subject to follow-up alcohol testing as directed by the Substance Abuse Professional. At a minimum, the employee shall be required to undergo six follow-up tests in the first 12 months after returning to work. The SAP may extend the follow-up testing for up to 60 months.

**Testing Positive for Alcohol Use**
Employees whose alcohol test is 0.02 or greater alcohol concentration are subject to termination under our zero-tolerance program. . .

> **Drug and Alcohol Use [Statement to be posted]**
> . . .
> Violations of this policy may lead to disciplinary action, up to and including immediate termination of employment.

After Sanville was terminated, Union Business Agent Steve Farrell requested that Boyle send him a copy of the applicable First Student drug and alcohol policy, since Farrell did not have the document. Boyle faxed Farrell an undated policy. It set forth testing requirements which were the same as the October 14, 2002 policy, and described the program as zero tolerance. In a section entitled "Consequences," it stated that employees who violated the policy "Will be subject to immediate termination." A section entitled "Positive Alcohol Tests" set forth a very different approach:

> Depending on the level of alcohol in the employee's system, the Department of Transportation requires First Student to act as follows:
>
> 0.02 to 0.039 The employee will be prohibited from performing safety-sensitive functions for 24 hours. . . . The employee will be prohibited from performing these functions until he or she has submitted to another test and has tested below 0.02.
>
> 0.04 or greater The employee will be suspended from duty pending an investigation by First Student management. The employee will be given the name and phone number of a Substance Abuse Professional.
>
> In addition to federal regulations, and at management discretion, a breath alcohol reading at any level under the conditions outlined in the "Prohibited Conduct" section of this document may be [sic] subject the employee to disciplinary action -- up to and including termination.

**Events of December 1.** Donna Sanville began working as a driver for the Company, or its corporate predecessors, in September, 1983. During her career, she has had exemplary attendance, and has never had an accident. Other than one verbal

reprimand some years ago relating to a day when she had to attend a court hearing, she had an absolutely clean disciplinary record. In 2004, she bid for and regularly drove three runs a day.

There is no dispute that Sanville failed to appear on December 1 for her AM run, and neglected to call in to inform the dispatcher that she would not cover the run. It is also not disputed that later in the morning Sanville came to the trailer to speak with Wilson, and that Wilson ultimately determined that Sanville should be taken for alcohol testing. The test results were .064 and .059. What is disputed are the circumstances which led up to, and which surrounded, Sanville coming to the trailer.

Wilson testified that she learned from Hopkins that Sanville had been a no call/no show for the morning run that day, but that the dispatcher had spoken with Sanville, who said she would be coming in to do her midday and afternoon runs. Wilson planned to give Sanville a verbal warning for the no call/no show; the safety coordinator told Hopkins to inform Sanville to report to the office before she went on her run. At about 10:30, Wilson asked Hopkins if she had seen Sanville. The dispatcher said she had not, but would radio to the bus to see if she was there. Wilson went back to her office and heard Hopkins call Sanville on the radio. As a result of overhearing the radio call, Wilson presumed Sanville had been on her bus. In any event, a few minutes later Sanville came into the trailer accompanied by Laurie Paul, the Union steward, who had previously been informed to make herself available for a disciplinary meeting.

When Sanville came into the back office, Wilson explained that she was giving her a verbal warning for being no call/no show that morning. Wilson said her failure to come or call in had resulted in school children being late, something the Company could

not accept. Sanville became upset, and some heated discussion ensued, before Sanville walked out of the inner office.

During the interaction, Wilson, who had been trained in recognizing the effects of alcohol, observed that Sanville's face was flushed, her eyes were bloodshot, and she had an odor of alcohol. Brown, who had been walking in and out of the meeting, noticed similar things. While Sanville was still in the outer office talking with Paul and Cathy Theberge, another driver, Wilson and Brown conferred. Wilson called her regional safety manager, and it was decided to send Sanville for reasonable suspicion alcohol testing. Brown then went to Sanville in the outer office and said the managers wanted to speak to her again. Once Sanville returned to the inner office, Wilson informed her of their decision and said she would take her for the testing. Sanville, who was very upset with Wilson, said she would not ride with the coordinator, so Brown took the employee.

Sanville testified that she had been out late the night before, celebrating her fiancé's birthday, and they had been drinking. As a result, she overslept and was awakened when Hopkins called at 7:30. The dispatcher stated that she would cover Sanville's morning run and Sanville should go back to bed. Hopkins called again at about 9:00 and asked if Sanville was coming in. Sanville replied that she was not, that she was still in bed, and she was not able to do her runs that day. Hopkins called a third time at about 10:15, and told Sanville that Wilson wanted to see her, so she had to come in.

Sanville got up and drove to work. She got a call from Hopkins on her cell phone at about 10:45 as she was pulling into the parking lot. She told the dispatcher where she was, and that she would be right in. As soon as she walked in the door of the outer

office, Sanville reiterated to Hopkins that she was not there to do her run. Sanville's car had been stolen two weeks before, and the keys to her bus were also stolen. Sanville did not ask for or retrieve the keys from the rack in the office. Instead, she went directly into Wilson's office, accompanied by Paul.

When Wilson handed her the documentation of a verbal warning for no call/no show, Sanville became upset. Sanville asked Wilson if she had never overslept. Sanville felt Wilson then "got an attitude" in response, pointing out that Sanville had caused many students to be late to school. This agitated Sanville more, so she called the coordinator "Miss Hoity Toity" and walked out of the office. Sanville complained to Theberge that after twenty-three years of service the Company should not treat her in this manner. Brown then called her back into the inner office, and Wilson told her she had to go for a reasonable suspicion alcohol test.

Paul testified that she was waiting in the outer office for Sanville to arrive, chatting with Theberge. Paul was anxious about being late for her midday run, so she asked Hopkins when Sanville would be in. Hopkins called Sanville on her bus but got no response. The dispatcher then called Sanville on her cell phone, and Sanville replied that she was in the top parking lot and would be right there. As soon as Sanville came in the door she said to Hopkins, "I am not here to work. I hope you're covering my K, because I am not working." Hopkins asked what she was supposed to do now, since it was so close to the K departure and it was hard to get someone to start the bus.

At that point Paul and Sanville were called into the inner office. After Wilson and Sanville exchanged words over the verbal warning, Sanville went back out to Hopkins and stated, "I hope you are covering my day, because I am not working." Brown then

came out and directed Sanville to return to Wilson's office. Wilson stated that they were sending Sanville for alcohol testing because they smelled alcohol. Paul testified that she was new in the role of steward, and did not know that if an employee is not working, he or she can refuse to take the test without adverse consequence. Although aware that Sanville had stated she was not there to work, Paul did not think to call the Union attorney or business agent before Sanville was taken off for testing. It was Paul's understanding of the drug and alcohol policy that any violation would result in dismissal.

Theberge testified that she was present in the office when Sanville came in on December 1. When she entered the office, Sanville stated to Hopkins that she was not there to work. Sanville and Hopkins began to have words and Theberge recalled there was quite a commotion.

Hopkins was called as a rebuttal witness by the Company. She testified that she was informed at 7:00 on December 1 by another driver that Sanville's bus was not yet started. Hopkins called Sanville's house and cell phone and got no answer. Hopkins assigned another driver to cover the AM route. Later in the morning Hopkins called Sanville's house again and spoke to a male, who said Sanville was at work. Hopkins replied that she was calling from work and Sanville was not there. The male went to look for Sanville and eventually the employee got on the phone. Hopkins asked if Sanville would be coming in for her midday run, because if she was not Hopkins had to start calling to get coverage. Sanville asked if she had to come in and Hopkins repeated what she said initially. Sanville then stated that she would be in. As a result, Hopkins did not call to arrange for a substitute driver, as she did that day to fill other openings.

At about 10:45, Wilson asked Hopkins to contact Sanville to make sure she came into the office before she went out on her route. Hopkins recollected that she reached Sanville on her cell phone, and Sanville stated she was in the parking lot and would be right there. Theberge and Paul were in the office when Sanville arrived. Hopkins did not recall Sanville saying anything to her; Hopkins stated only that she would tell Wilson Sanville had arrived. Hopkins could not hear any of the conversation in the back office. Some time later Sanville emerged from the office and she was upset. Sanville told Hopkins that the dispatcher had to cover her K run, but did not explain why. Subsequently, Sanville was either escorted back into Wilson's office by Brown, or she was called back to the office.

**Termination Decision.** After Sanville was tested, Wilson received a call from the testing center reporting the results. Wilson called Boyle, who was home sick, with the information and Boyle concluded that pursuant to the Company's zero tolerance policy, Sanville should be terminated. Boyle called Petrozak, and recounted that Sanville had reported to work in an impaired condition, and that testing had revealed a breath alcohol reading in excess of .02. Petrozak believed that the Company's zero tolerance policy compelled the automatic termination of any employee who tested .02 or above, regardless of any other factors. He therefore did not check Sanville's seniority, attendance, or accident record before agreeing the termination was appropriate.

On December 6, Boyle sent Sanville a letter notifying her that she was being terminated, effective immediately. The letter included the following paragraph:

> "Reporting to work in an impaired or unfit condition because of the use or consumption of controlled substances or alcohol is strictly prohibited. Any employee who uses,

> possesses, or is involved in the sale or purchase of any substance covered under the Federal Controlled Substances Act, while on Company premises, conducting Company business or operating company equipment, it [sic] is considered to be in violation of Company policy. Any employment [sic] who violates this policy will be subject to immediate termination from employment with First Student."

It was determined at the arbitration hearing that the quoted paragraph came from some version of a national employee handbook.

Sanville was paid for the thirteen hours she worked on November 29 and 30, while performing her regular three daily runs. She was not credited with any compensable time on December 1.

**COMPANY POSITION**

The Company has the inherent management right to establish and enforce reasonable work rules. Given the nature of the Company's operations, its zero tolerance policy mandating termination of any driver who is assigned and reports for a route and who is found to have an alcohol level of .02 or higher, is appropriate. That it was not negotiated with the Union is of no consequence, given the fact that the Union has never objected to the existence or application of the policy. Further, the policy was well-known to all the employees, including Sanville.

On December 1, 2004, Sanville was scheduled to drive her regular route, which included three runs. After failing to report for the morning run, she came to work ready to do the K and afternoon runs. Sanville never mentioned to Hopkins or Wilson that she did not intend to drive her route, even when Wilson ordered her to go for testing. Paul

did not raise the claim that Sanville was not there to work, and could not be sent for testing, nor did the steward attempt to call the Union president or attorney for guidance. This self-serving defense was first mentioned only after the termination.

Based on her observations, Wilson fortunately suspected that Sanville was unfit to work. The subsequent testing confirmed Sanville had an elevated alcohol level. Consistent with Petrozak's testimony that all employees who test .02 or above are terminated, Sanville was let go. Given the zero tolerance approach, Sanville's long record of discipline-free service was simply not a relevant consideration.

**UNION POSITION**

Sanville was terminated for reporting for work in an impaired condition. While the Union does not challenge the test results which indicated that Sanville had an elevated level of alcohol, it does challenge that she reported for work on December 1. The Company therefore had no right to send her for a test, or to administer any level of discipline beyond the oral warning for failing to timely call in before missing her morning run. Since this issue is dispositive, the Union will not address the numerous other questions raised regarding the terms and disciplinary impact of the Company's drug and alcohol policy.

It may well be that based on their telephone calls, Hopkins was under the belief that Sanville would be coming into work, and after receiving the oral warning from Wilson, would complete her runs for the day. As attested to by Sanville, Paul, and Theberge, however, Sanville was quite explicit when she came into the office that she was not there to work. Given the fact that she had not gone to her bus, that she had no

keys and did not request keys from Hopkins, and that she never told Hopkins or Wilson that she was there to work, it is clear she had no intention of getting into a Company vehicle and driving children. Wilson incorrectly assumed that Sanville had been reached while in her bus, and so erroneously concluded that Sanville had come to drive; Wilson never asked Sanville if she was there to commence work. In light of her misconception, Wilson's directive that Sanville go for reasonable suspicion testing was done in good faith, but it was invalid. Since Sanville was not at work to drive a route, that she tested above .02 could not be the basis of any discipline, let alone discharge. She should be reinstated with full back pay, seniority and benefits, with the arbitrator retaining jurisdiction if the parties are unable to compute the exact remedy.

**OPINION**

**<u>Issues Not Reached.</u>** As was mentioned in the Background section, there was much confusion as to which version of the Company's unilaterally promulgated alcohol and drug testing policy was extant at the time of the discharge. Questions exist as to whether the declaration that a policy is "zero tolerance" is inconsistent with provisions referencing discipline "up to and including termination," and a section which describes "follow-up testing." Further, arguments can be made about the impact of a just cause provision on the Company's right to unilaterally impose a "zero tolerance" policy.

There is no need to address these over-arching questions in order to resolve this grievance. Under the practice that cases should be decided on the narrowest possible grounds, and dicta should be avoided, no opinion will be expressed as to whether the Company may discharge any and all employees who test .02 or above.

<u>Sanville Should Not Have Been Tested.</u> Under Article 22 of the collective bargaining agreement, employees who are "scheduled or assigned" for work cannot avoid testing by leaving after being told to submit to a sample, either for reasonable suspicion or random testing. The rationale for this is obvious. If employees could escape detection simply by claiming illness or personal emergency after being told to report for testing, the testing procedure would be easily circumvented.

The practice implementing the drug and alcohol testing program has been for employees to be notified while they are performing their morning run that they are to report when they return to the yard to provide a sample. There can be no question that such employees are "scheduled or assigned to perform work." An employee who had bid on a route, and who is therefore normally expected to complete that route, but who has not reported for work at all that day, is not "scheduled or assigned to perform work" as that phrase is used in Article 22. There was no evidence the Company ever required employees who were out on a personal day or sick leave to report for testing, simply because they had bid on the route. Given that the rationale of the drug and alcohol testing program is to insure that drivers not operate vehicles in an impaired condition, it makes sense that employees not be subject to testing on a day they are not driving a vehicle.

The dispositive factual conclusion in this case is that although she was called to the Company's yard on December 1, 2004, Sanville did not come for the purpose of driving a Company vehicle. She never got into her assigned vehicle, and she had no intention to driving children that day.

There is no way of knowing for sure what was said between Hopkins and Sanville during the three telephone calls to Sanville's house. It is entirely possible that after the

conversations Hopkins was under the impression that Sanville would be coming in and would complete the balance of her bid route. This would explain why Hopkins did not arrange coverage for Sanville's K run. Further, Hopkins may have conveyed this impression to Wilson. The fact that Wilson wrongly believed Hopkins had reached Sanville over the bus radio no doubt reinforced Wilson's understanding that Sanville had come to the yard to drive that day.

In fact, it is clear that Sanville never went to her vehicle. She was reached on her cell phone as she got to the yard in her car. She did not have keys for the vehicle and could not have operated the bus without first obtaining the spare set from Hopkins. It is undisputed that at no time did Sanville ask for the keys to the vehicle. This tends to corroborate the testimony of Sanville, Paul, and Theberge that upon entering the office Sanville told Hopkins that she was not there to work.

What happened after the initial interaction with Wilson in the inner office confirms that Sanville never intended to drive on December 1. She had come in for the sole purpose of meeting with Wilson, pursuant to a direction from Hopkins. Wilson notified Sanville that she was being given a warning for the no call/no show, and this notification triggered Sanville's angry response and departure from the office. Upon getting to the outer office, Sanville did not ask Hopkins for the keys to the vehicle, despite the fact that it was getting very close to the time for the K run. To the contrary, according to Hopkins's testimony, when Sanville emerged upset from her meeting with Wilson, Sanville told the dispatcher that Hopkins would have to cover her K run. Hence, by the dispatcher's own testimony, it is clear that before Sanville was called back to the

office and directed to submit to testing, the Company was on notice that Sanville would not be driving that day.

Since Sanville never intended to drive on December 1, she was not "scheduled or assigned," as that phrase is used in Article 22. The Company therefore did not have the right to have her submit to reasonable suspicion testing. The fact that she had in excess of .02 alcohol on a day she was not going to be driving did not provide the Company with a basis for imposing any discipline. That Paul, an inexperienced steward, did not think to advise Sanville to refuse to be tested, is of no significance. Even assuming Paul had thought to provide this advice, or to call the Union's business agent or attorney, the more prudent course of action would have been for Sanville to follow the directive to provide the sample, and then file a grievance. Refusing to provide a sample when ordered to do so would have been a high risk, and inappropriate, method of challenging the Company's interpretation of the collective bargaining agreement.

**AWARD**

The grievant, Donna Sanville, was terminated without just cause. She shall be retroactively reinstated with full back pay, less interim earnings; seniority; and benefits. The Arbitrator will retain jurisdiction for the sole purpose of resolving any dispute as to the implementation of this remedy.

Mark L. Irvings

Mark L. Irvings
Arbitrator

February 6, 2006