**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **FIRST STUDENT,**<br>**Plaintiff,**<br><br>**v.**<br><br>**AMALGAMATED TRANSIT UNION, DIVISION 618,**<br>**Defendant,** | **C.A. No. 06-207T** |

**MEMORANDUM OF AMALGAMATED TRANSIT UNION, DIVISION 618**

***In Support of the Union's Motion to Confirm the Arbitration Award and in Opposition to First Student's Motion to Vacate the Arbitration Award***

Gerard P. Cobleigh, #0232
70 Jefferson Boulevard
Warwick, RI 02888
(401) 941-5900
(401) 461-4107 (fax)

Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0065
(401) 421-0964 (fax)

# TABLE OF CONTENTS

**Page**

I. Facts and Travel....................................................................................3

II. Standard of Review.................................................................................7

III. Argument..........................................................................................8

A. The Arbitrator's Award Should be Confirmed................................8

*The Arbitrator Correctly Determined that the Company Had No Basis to Fire Sanville if She Had No Intention to Work*……………8

B. The Company's Motion to Vacate Must be Denied………………13

1. The Federal Regulations……………………………………......13

2. The Arbitrator's Power to Interpret the CBA……………………..15

3. Public Policy……………………………………………………….17

IV. Conclusion……………………………………………………………..21

Certification…………………………………………………………...22

## I. Facts and Travel.

This case involves a dispute between the Plaintiff-company, First Student, Inc., ("First Student" or "company"), and the Defendant-Union, Amalgamated Transit Union, Division 618, ("Union"), which arose after First Student fired bus driver Donna Sanville ("Sanville"), a twenty-one-year employee of the company. The company fired Sanville because she had a blood-alcohol level in excess of .04, on a day when she had no intention of driving a bus, and had only appeared on company property after being ordered to do so by a supervisor. Because this firing lacked just cause, and constituted a violation of the applicable collective bargaining agreement ("CBA"), the Union filed a grievance on behalf of Sanville. See *Collective Bargaining Agreement*, Company Exhibit 1. The Arbitrator resolved the grievance in favor of Sanville, ordering reinstatement. The company responded with a motion to vacate. Thereafter, the Union filed an objection and its own motion to confirm the award.

The following facts are taken from the Arbitrator's decision unless otherwise provided. See *Decision of the Arbitrator*, Company Exhibit 2. For over twenty-one years, Sanville worked as a bus driver for First Student. Prior to December 1, 2004, Sanville had an exemplary record, including perfect attendance records over a ten-year period, bonuses, an admirable accident record, and no discipline of consequence over the course of her career. All of this changed on December 1, 2004. That day, Sanville was scheduled to make three separate runs with her bus: (1) an "A.M. run," with a pull-out time of approximately 6:45 a.m.; (2) a kindergarten run (approximately 10:50 a.m.) and (3) a "P.M. run" at approximately 1:30 p.m. When Sanville failed to appear for the A.M. pull-out, dispatcher Lynn Hopkins called her at home concerning her status. While the number of calls made and

the specifics of the conversations which took place were the subject of conflicting testimony, it is at least agreed that Hopkins conveyed to Sanville that she was to report to supervisor Ann Wilson ("Wilson"), in consequence of missing her A.M. run. The parties further agree that the purpose of the meeting was to present Sanville with a verbal warning for her "miss" and that Sanville did appear as requested at approximately 10:45 a.m.

Upon receiving the warning Sanville became upset and left Wilson's office, only to be called back several minutes later and directed to take a breath alcohol test which resulted in a positive result. She was thereupon terminated. The Union filed a grievance. The grievance proceeded to arbitration which took place in November 2005. At the arbitration, six witnesses testified, presenting the facts as they understood them.

Sanville testified that she did, in fact, consume alcohol the evening prior to December 1, and slept beyond her 6:45 a.m. pull-out. When she overslept, she had no plans to report to work that morning. Thus, there is no dispute that Sanville was, <u>for the first time in her career</u>, a no-call, no-show. There can be no question that there was no basis to terminate Sanville for a single incident (in twenty-one years) of being "hung over," and missing a shift.

However, the company then insisted that Sanville report to work. Sanville testified that Hopkins called her home three times on the morning of December 1, 2004, and insisted that she report to work to speak with Wilson. Hopkins even continued to call Sanville's cell phone as she drove into the bus yard. During the last phone call, Sanville told Hopkins that she was only there to report to Wilson, not to work. Sanville further testified that she reiterated (to Hopkins) that she was not going to work the first time she exited Wilson's office (<u>i.e.</u>, prior to being recalled to the office and being directed to report for alcohol

testing). Sanville, along with all the other witnesses, did not dispute that she was quite upset with Wilson about the reprimand, given her history with the company.

Lori Paull ("Paull"), a long-term bus driver with the company and a union steward, also testified at the hearing. She testified that she was called in off the road at approximately 9:00 a.m. and advised by Wilson to report to the office in her capacity as Sanville's union representative. Paull was with Sanville in Wilson's office and also in the outer office which served as Hopkins' work location. She testified that Sanville spoke to Hopkins when she first exited Wilson's office and commented to Hopkins, "I hope you covered my run because I'm not working." Paull further testified that she was unsure how to handle the situation and, therefore, did not advise the grievant that she had the right to refuse the blood-alcohol test since she was not working.

Carol Theberge ("Theberge"), a driver who happened to be in the dispatch office when the grievant initially left Wilson's office, recalled little of the conversation other than the fact that Sanville was "kind of upset," and stated "I'm not working."

Joseph Petrozak ("Petrozak"), a company supervisor, testified for the company, along with Ann Wilson. Among other things, Petrozak spoke about company policies relating to drug and alcohol testing. The most recent policy, dated October 14, 2002 included concepts of zero tolerance, as well as the statement that "violations of this policy may lead to disciplinary action, up to and including immediate termination of employment." Petrozak, on cross-examination admitted that no consideration was given to the grievant's prior record, that he saw no difference between the concepts of "zero tolerance" and "discipline up to and including termination," and that he was unaware of any negotiation or notice to the Union

involving the drug/alcohol policy. He also affirmed that the grievant did not fill out her time card and was not paid for any time on December 1, 2004.

Although it is not entirely clear, it appears that Wilson was informed by Hopkins that Sanville had missed her early morning run and had asked Hopkins to tell Sanville to report to her for the purpose of receiving a written reprimand. She was vague about the details of her initial conversation with Sanville, but recalled observing alcohol-related symptoms and directing Sanville to come back into her office and then report for a drug/alcohol test. On cross-examination, Wilson admitted she never asked Sanville if she intended to work that day, but assumed she did because drivers usually go directly to their buses and she "assumed" Hopkins had contacted Sanville on her bus radio. Wilson further acknowledged that Sanville never signed her time card for December 1 and was not paid.

John Brown ("Brown"), recalled little of the events of the day in question other than his observations concerning Sanville's condition and his role in the drug testing process. Hopkins also testified, concerning her telephone conversation with the grievant and her concerns about covering Sanville's runs. She confirmed that before December 1, Sanville had lost her personal bus keys and on that morning, had not asked for the company's keys.

Following this testimony, the Arbitrator, examining the relevant provisions of the contract, applicable law, and company policy, concluded that the company did not have just cause to fire Sanville for failing the blood-alcohol test if she was not going to be driving a bus on the day in question. This ruling, grounded in the language of the contract and in the common law of the shop made sense - since to conclude otherwise would mean that employees basically could not consume alcohol, even off the job, since the company could conceivably call that employee into work and issue a blood alcohol test. The company's

view would allow test an employee home sick and then terminate that employee for a positive result. This ruling required the arbitrator to make a first-hand credibility determination and based on his assessment, he decided that Sanville's version of the events was credible (as corroborated by the other witnesses). Notably, nothing in company policy, federal law, or contract, requires an employee to be fired for a first-time violation of the alcohol policy - - especially considering the violation occurs off-duty.

Despite this, the company filed the instant motion to vacate, arguing essentially that it is irrelevant whether Sanville intended to drive or not, and that the company has the absolute discretion to randomly test employees - - and fire them for violations. For the following reasons, the company's motion to vacate must be denied and the Union's motion to confirm must be granted.

## II. Standard of Review.

"The authority of a federal court to disturb an arbitration award is tightly circumscribed. While the award must 'draw its essence from the contract' that underlies the arbitration proceeding, courts will deem that benchmark achieved as long as the arbitrators are 'even arguably construing or applying the contract and acting within the scope of [their] authority. * * * That a reviewing court is convinced that the arbitrators may have committed error - - even serious error - - does not justify setting aside the arbitral decision. * * * This remains true whether the arbitrators' apparent error concerns a matter of law or a matter of fact." Cytyc Corp. v. DEKA Prods., Ltd. P'ship, 439 F.3d 27, 31 (1st Cir. 2006) (citing Advest, Inc. v. McCarthy, 914 F.2d 6, 8 (1st Cir. 1990)).

The only exceptions are contained in the Federal Arbitration Act, 9 U.S.C. § 10. "The operative provision, section 10(a) of the FAA, authorizes vacatur only in cases of

'specified misconduct or misbehavior on the arbitrators' part, actions in excess of arbitral powers, or failures to consummate the award." Id. (quoting Advest, 914 F.2d at 8).

## III. Argument.

### A. The Arbitrator's Award Must be Confirmed.

*The Arbitrator Correctly Determined that the Company Had No Basis to Fire Sanville if She Had No Intention to Work.*

If Sanville had no intention to work on December 1, 2004, it is totally irrelevant that she tested positive for alcohol. Accordingly, she should not have been fired for testing positive for alcohol consumption since she had no plan to drive her bus that day. Common sense dictates this result, because otherwise, the company could call in an employee, who for example, had already called in sick, and if that employee happened to be drinking, the company's view would permit it to test that employee for alcohol consumption and then terminate the employee if a positive test resulted, even if that employee never intended on operating a bus that day. Accordingly, an essential element of the company's burden before the arbitrator was to demonstrate that the grievant intended to work on December 1, when she presented herself on company premises. Because the company was unable to establish this fact, its discipline could not be upheld.

The Arbitrator made two critical determinations, upon review and interpretation of the contract, and upon hearing all the parties' testimony. First, the Arbitrator found that pursuant to Article 22 of the CBA, in order to administer a drug test to an employee, the employee must have intended to drive a bus that day. Article 22 of the CBA, entitled "Drug Testing," provides:

> "The Company shall pay an employee required to have a drug and/or alcohol test one (1) hour's pay at the

> employee's regular rate of pay, but only if the employee tests negative.
>
> An employee shall only be required to submit to a drug and/or alcohol test on a day during which they are scheduled or assigned to perform work." Company Ex. 1, *Article 22* (emphasis added).

Looking at that provision against the background of the bus driving job, and specifically, the words "scheduled or assigned," the arbitrator stated the following:

> "The practice implementing drug and alcohol testing program has been for employees to be notified while they are performing their morning run that they are to report when they return to the yard to provide a sample. There can be no question that such employees are 'scheduled and assigned to perform work.' An employee who had bid on a route, and who is therefore normally expected to complete that route, but who has not reported for work at all that day, is not 'scheduled or assigned to perform work' as that phrase is used in Article 22. There was no evidence that the Company ever required employees who were out on a personal day or sick leave to report for testing, simply because they had bid on the route.[1] Given that the rationale of the drug and alcohol testing program is to insure that drivers not operate vehicles in an impaired condition, it makes sense that employees not be subject to testing on a day they are not driving a vehicle." (emphasis added). See Ex. 2.

In summary, the Arbitrator concluded that the words "scheduled or assigned," were designed to set some parameter for when employees could be tested so that someone could

---

[1]At First Student, anyone who bids on a route (and therefore, is scheduled to occupy that route for a certain time period) would be technically "scheduled or assigned to perform work" every day that route is in operation. For Ms. Sanville, that would mean she was technically scheduled to perform work every week, Monday through Friday. That does not account for the fact that even if she is scheduled for a shift, she might not actually work that shift due to illness, among other reasons. It does not take into account that an employee could have a blood-alcohol level in excess of .04 after working hours. This makes clear that the company's restrictive reading of Article 22, makes no practical sense.

not escape testing after reporting to work. For example, it would defy common sense for the language to restrict the company from testing an employee if the employee was about to operate the vehicle in an impaired condition. However, those words could not be interpreted to produce an absurd result - - where an employee could be tested and disciplined, when the employee had no intention of driving.

The Arbitrator's interpretation of Article 22, against the background of the common law of the shop and the facts before him, is not only permissible, but it is exactly what he is charged to do to resolve the parties' dispute. See, e.g., United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574 578-79 (1960). As the Supreme Court has noted:

> "The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. * * * It is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, it is the institutional characteristics and the governmental common law of the shop which implements and furnishes the context of the agreement." Id. at 578-580.

The second critical assessment the Arbitrator had to make concerned witness credibility. The Arbitrator had before him six different witnesses, all of whom testified as to the facts as they perceived them. Based on what was presented, the Arbitrator believed that

Sanville had no intention of working on December 1. The following constituted ample evidence from which the Arbitrator could reasonably make that conclusion.

Wilson never spoke with Sanville directly before she reported to Wilson's office. At no time did Sanville indicate to Wilson that she was reporting for duty, nor did Wilson ask that question. Other than Hopkins' version of her conversation with Sanville, there was no objective evidence (other than the fact that Sanville was on company premises in a time frame which could be construed as consistent with her work schedule) to support the employer's burden on that issue. Even this fact could be given little weight since everyone agreed Sanville had to be called repeatedly to get her to report and that by the time she reported, she clearly was not going to drive two out of the three runs, because of the time. As noted above, Sanville reported to Wilson at approximately 10:45 a.m. Her second run was scheduled to leave at 10:50 a.m. There is no way that, based on the events which took place from the time Sanville reported to the time she first left Wilson's office, she planned to make her 10:50 a.m. run.

Instead, the undisputed facts showed the following. First, Ms. Sanville's personal vehicle and car keys had recently been stolen and as a result, she did not have a personal key to her bus on December 1, 2004. Second, the company's bus keys were in the possession of Hopkins. The keys are necessary to perform the pre-test of the vehicle, to operate the radio and to start the vehicle. Next, Sanville never requested the keys from Hopkins. Sanville never filled in her time card for December 1, 2004, nor was she paid for any time on that date. Finally, Sanville never operated any company equipment on the day she was

terminated.[2] It appeared from the testimony that Hopkins was under the impression, based upon her conversation with Sanville, that Sanville would work her remaining trips. These conversations, of course, took place before Sanville reported to the office. Based on the testimony of Paull, Theberge and Sanville, herself, all of which was uncontradicted, the grievant was emphatic, when she arrived at the office, she was not there to work.

[2]The Union did not contend that actual operation of a vehicle is a necessary element of the employer's burden of proof in cases of impairment, but does suggest that the grievant's failure to go to her bus prior to reporting to the office is additional evidence of her announced intention not to work on December 1, 2004.

The Arbitrator's interpretation of the contract and factual findings made sense. Some objective evidence of intent to work must be required before a termination based upon impairment can be sustained. Sanville's mere presence cannot provide that evidence since she was directed by Wilson to report to her office.[3] The arbitrator accepted the testimony of Sanville, Paul and Theberge, in deciding that the company had not met that burden. Even if Wilson acted in good faith based on her assumption that Sanville was reporting for duty in an impaired condition,[4] that assumption is insufficient to sustain the company's burden to show that Sanville actually intended to work.

Accordingly, the Arbitrator's award should be confirmed.

### *B. The Company's Motion to Vacate Must be Denied.*

#### *1. The Federal Regulations*

The company argues that certain federal regulations support their view that not only did it have the power to administer the test, but that its decision to terminate Sanville is required. Neither of these submissions should be accepted by the Court.

The first critical point is that there is absolutely nothing in the federal regulations that speaks to the appropriate measure of discipline for a bus driver whose blood-alcohol content exceeds the prescribed limitations. Accordingly, even if the arbitrator found that the

---

[3]Of course, Sanville could have refused to report to Wilson and could have refused the blood alcohol test. She would then have been subject to a charge of insubordination. Given the results of the day, that would be a preferable choice, but she cannot be faulted in hindsight for responding to a directive.

[4]Wilson testified that she "assumed" Sanville had gone directly to her bus and been contacted on the bus radio by the dispatcher. As the facts developed, however, the grievant had never gone to her bus and even if she had, could not have operated her bus without her keys. The conversation which Wilson overheard between Sanville and Hopkins took place on cell phones.

company could have tested Sanville on the morning of December 1, 2004, nothing precludes the arbitrator from determining, based on the facts and circumstances, whether testing positive is just cause for termination.

Second, according to the federal regulations, the company is not required, and in fact, not even allowed, to test an employee who is not about to drive a bus or has not just driven a bus. The pertinent language is as follows:

> "A driver may be directed by the employer to only undergo reasonable suspicion testing while the driver is performing safety-sensitive functions, just before the driver is to perform safety-sensitive functions, or just after the driver has ceased performing such functions." 49 C.F.R. § 382.307(d)[5] (emphasis added).

Accordingly, the company's assertion to this Court that it was required to direct Sanville to take an alcohol test is contradicted by the very regulation it relies upon. If anything, the regulation prohibited testing of Sanville because, as the arbitrator found, Sanville was not about to drive a bus, had not driven a bus, and had not just driven a bus.[6] Again, whether or not she was about to perform safety-sensitive functions is a factual question, which the arbitrator resolved in Sanville's favor based upon his evaluation of the testimony and the credibility of the witnesses.

---

[5]Subsection (d) of the federal regulation speaks specifically to when alcohol testing is authorized as prescribed in subsection (a).

[6]The company argues that Wilson was required to perform the test because Sanville was scheduled to work on the day she was tested and she was tested "'just before' or 'just after' she was scheduled to perform safety-sensitive functions, in conformance with federal regulations." Company Brief at p. 10, n.1. The Court must be made aware that nowhere in the federal regulation does the word "scheduled" appear. Accordingly, testing is not required when scheduled to perform safety sensitive functions.

In addition, this portion of the regulation proves that the Arbitrator was not infusing the contractual language with his own brand of justice when he made the common sense interpretation that the language "scheduled or assigned," must incorporate some kind of an "intent to drive." If anything, this is totally consistent with the federal regulation that would not otherwise permit an alcohol test. The Union submits that the federal drafters were doing just that - incorporating an "intent to drive" requirement when it prohibited testing unless a driver was about to drive, is driving, or had just finished driving.

*2. The Arbitrator's Power to Interpret the CBA.*

The similarity between the federal regulation and the "intent to drive," finding by the arbitrator leads to the next issue raised by the company. The company submits that the arbitrator has no authority to interpret the Article 22 of the contract. Specifically, the company argues that the Arbitrator "invented" the "intent to drive" requirement, and as such, he exceeded his powers. This argument amounts to the company taking issue with the Arbitrator's interpretation of the very provision it was charged with interpreting.

Article 22 provides that the employee can only be required to submit to a drug and/or alcohol test on a day during which they are scheduled or assigned to perform work. Again, the CBA provision is totally consistent with the federal regulation. The Arbitrator is specifically vested by the clear terms of the CBA to interpret the contract. That is his duty and the reason why the parties submit grievances to the labor arbitrator - so that based upon the contract language, the common law of the shop, and the evidence, the arbitrator can resolve the labor dispute and the parties do not have to bring their differences to the judicial forum.

The company's argument flies in the face of well-settled law. Since the Arbitrator is specifically vested with the power to interpret the agreement - he could not have exceeded his powers by doing so. As the Seventh Circuit as recognized,

> "It is tempting to think that courts are engaged in judicial review of arbitration awards under the Federal Arbitration Act, but they are not. * * * When parties agree to arbitrate their disputes they opt out of the court system, and when one of them challenges the resulting arbitration award he perforce does so not on the ground that the arbitrators made a mistake but that they violated their agreement to arbitrate, as by corruption, evident partiality, exceeding their powers, etc. - - conduct to which the parties did not consent when they included an arbitration clause in their contract. That is why in the typical arbitration, which unlike the one in this case is concerned with interpreting a contract, the issue for the court is not whether the contract interpretation is incorrect or even wacky but whether the arbitrators failed to interpret the contract at all, * * * for only then were they exceeding the authority granted to them by the contract's arbitration clause." Wise v. Wachovia Securities, LLC, 450 F.3d 265, 269 (7th Cir. 2006) (internal citations omitted).

The company has pointed to two cases, for the proposition that when an Arbitrator converts the company's discipline, he impermissibly adds to or modifies the CBA. However, both the Mountaineer and S.D. Warren cases are distinguishable since both CBAs gave the Arbitrator no discretion since they provided for immediate termination for a violation of the company policy (incorporated into the CBA) at issue. The Mountaineer case involved an employee who tested positive for marijuana use and was engaged in a safety-sensitive job as a natural gas meter repairman. Id. at 607. The undisputed company policy provided that anyone caught with a positive drug test would be fired, which the union had attempted to challenge by arbitration and lost. There was no language in the CBA that put any restrictions on when the company could issue a drug test.

By contrast, the company policy in this case is totally inconsistent. The policy at issue, which has never been made part of the CBA, includes the concept of zero-tolerance and at the same time provides for discipline up to and including termination. Because the policy is not incorporated into the CBA, there is no specific restriction on the Arbitrator's power to impose a less drastic sanction. In addition, even if the policy somehow restricted the Arbitrator's power, it specifically allows for discipline less severe than termination. The reason why the Arbitrator's decision in Mountaineer was unacceptable was because it was inconsistent with a company policy enacted pursuant to the collective bargaining agreement which is a fact simply not present here.[7] Similarly, in S.D. Warren, the company policy which expressly provided that any employee who possesses or uses drugs will be terminated, was appended to and incorporated into the CBA. There was no such restriction on the Arbitrator's power in this case. Id. at 180-181.

*3. Public Policy*

The company next argues that Rhode Island public policy against drunk driving requires that this arbitration award be vacated. This argument should be totally disregarded because of one fact - the evidence showed that Donna Sanville was not drunk driving, and had no intention to drive a bus at all.[8] Even if one entertains this argument under the

[7]The Union would also submit that the facts are vastly different when the employee at issue in Mountaineer tested positive for drug use, where Sanville had drank alcohol the previous evening and had no intention of working on the day in question. The fact that Sanville never intended to work means one never reaches the company policy issue, as the Arbitrator aptly noted in his decision. Ex. 1, p. 14.

[8]Significantly, the law in Rhode Island prohibits driving while intoxicated which is measured as having a blood-alcohol in excess of .08. See G.L. 1956 § 31-27-2. Sanville's blood alcohol content on December 1, did not exceed .08.

applicable law, it is clear that public policy cannot provide a basis to refuse enforcement of this award.

The United States Supreme Court has spoken directly on when public policy can provide the basis to refuse enforcement of an arbitration award. In the same case, the Court set forth other important provisions applicable to this Court's power to vacate Arbitration awards on similar facts. See Misco, 484 U.S. at 31. In Misco, the United States Supreme Court determined that the Court of Appeals had incorrectly refused to enforce an arbitration award which found that an employee who was discharged for violating a company rule against marijuana on company premises should be reinstated. In particular, the arbitrator found that the company had failed to prove that the employee had possessed or used marijuana on company property. Id. at 34. The arbitrator had refused to accept into evidence the fact that a marijuana cigarette had been found in the employee's car on company premises because the company did not know about it at the time the employee was fired. Id. The case proceeded to federal court on the employer's motion to vacate. The district court judge held that the award must be vacated because it was contrary to public policy regarding safety on the job and criminal laws against drug possession. Id. at 34-35. The Court of Appeals reached the same conclusion, based on the public policy relating to safety when using hazardous machinery. Id. at 35.

On review, the Supreme Court found that the federal courts had made a grave error in vacating the Arbitrator's award. First, the Court found that the Court of Appeals:

> "was not free to refuse enforcement because it considered Cooper's presence in the white Cutlass, in the circumstances, to be ample proof that [company policy] was violated. No dishonesty is alleged; only improvident, even silly, fact finding is claimed. This is hardly a sufficient basis for

> disregarding what the agent appointed by the parties determined to be historical facts." Id. at 39.

The Court then addressed the issue of whether the Court of Appeals could set aside the award because, in its view, discharge was the appropriate remedy. The Court noted that in the normal case, the Arbitrator is free to disagree with the company's decision regarding what sanction to impose on the employee. Id. at 41. The only exception is where the parties themselves, in the context of the CBA, limit the arbitrator's discretion with respect to the proper measure of discipline. Id. The Court determined that in Misco, since the parties expressly submitted the issue to the arbitrator whether there was in fact just cause for the discharge, and that the Arbitrator recognized company policy but noted that it only listed causes for discharge and did not expressly provide for immediate discharge, the Court of Appeals could not vacate on this basis. Id. at 42. Similarly, the Arbitrator in Sanville's case specifically recognized the company policy, the federal regulations and the CBA, and noted that because Sanville never intended to drive, the employer's termination lacked just cause. Nothing in the CBA, regulations or policy prohibited such result or limited his power to make that determination.

Finally, the Court reviewed whether the Court of Appeal's reliance on public policy to vacate the award was appropriate. In Sanville's case, the company has argued that her termination was mandated by public policy. In Misco, the Court restated its prior holding in the W.R. Grace case that "the question of public policy is ultimately one for resolution by the courts. * * * We cautioned, however, that a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violated 'some explicit public policy' that is 'well defined and dominant, and is to be

ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."'" Id. at 43 (quoting W.R. Grace, 461 U.S. at 766). The analysis must center on whether the award "created any explicit conflict with other 'laws and legal precedents.'" Id.

In this case, even if one accepts the public policies enunciated by the company as being well-defined and dominant, etc., it is clear that there is no direct conflict between the Arbitrator's interpretation of the contract language and any such public policy. As noted above, there is no evidence that Sanville was drunk-driving on the day in question. As such, like in Misco, there is no violation of the policy in question. Id. at 44.

> "In pursuing its public policy inquiry, the Court of Appeals quite properly considered the established fact that traces of marijuana had been found in Cooper's car. Yet the assumed connection between the marijuana gleanings found in Cooper's car and Cooper's actual use of drugs in the workplace is tenuous at best and provides an insufficient basis for holding that his reinstatement would actually violate the public policy identified by the Court of Appeals 'against the operation of dangerous machinery by persons under the influence of drugs or alcohol.' * * * A refusal to enforce an award must rest on more than speculation or assumption." Id.

Here, the first important undisputed fact is that Sanville's blood alcohol level did not exceed .08, the limit imposed by state law. Second, there is no relationship between Sanville's test which exceeded .04 and drunk-driving since she never drove a bus that day. Thus, there is no basis for holding that Sanville's reinstatement would actually violate state law which prohibits drunk-driving. As noted above, a refusal to enforce an award on this basis cannot rest on speculation or assumption.

In addition, relying on various statutes, the company has asserted there is a public policy which requires bus drivers to be safe operators. There is simply no evidence that

Sanville did not hold the proper licenses, or was not properly trained. Again, there is no basis for holding that reinstating Sanville would violate any "bus-safety" law.

The final argument made by the company as it relates to public policy is its general statement that "[h]anding the keys of a school bus to a bus driver who was intoxicated on a scheduled work day is precisely what Rhode Island's policies are intended to prevent." Company Brief at p. 13. In this case, the company does not point to any different specific, well-defined and dominant public policy on point. The problems with this argument are many. First, it assumes, incorrectly that Sanville intended to drive her routes on the day in question which is totally contradicted by the evidence. The evidence simply does not support the conclusion that she intended to drive with a blood-alcohol concentration in excess of .04 on December 1. Further, no one is handing the keys to an impaired bus driver as a result of the reinstatement. There is no evidence that if reinstated, Sanville would ever report to work, intending to drive, in an impaired condition. Accordingly, the argument that reinstating Sanville would somehow violate a public policy has no basis in fact or law.

**IV. Conclusion.**

Based on the foregoing, it is obvious that the Arbitrator properly performed his function and that the company's motion to vacate boils down to a disagreement with the Arbitrator's conclusion which fails to establish a sufficient basis to disturb the Award. Accordingly, the Union requests that the Court deny First Student's motion to vacate the arbitration award and grant the Union's motion to confirm.

Defendant,
By its Attorneys,

Gerard P. Cobleigh, #0232
70 Jefferson Boulevard
Warwick, RI 02888
(401) 941-5900
(401) 461-4107 (fax)

/s/ Carly Beauvais Iafrate, Esq.

Carly Beauvais Iafrate, #6343
129 Dyer Street
Providence, RI 02903
(401) 421-0065
(401) 421-0964(fax)

**CERTIFICATION**

I hereby certify that this document has been filed electronically on this 6th day of April 2007 and is available for viewing and downloading to the ECF registered counsel of record:

Via Electronic Service/ECF:

Mark A. Pogue, Esq.
mpogue@eapdlaw.com

John Doran, Esq.
jdoran@eapdlaw.com

/s/ Carly Beauvais Iafrate, Esq.