UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FIRST STUDENT, INC., Plaintiff, | ) | |
| v. | ) | C.A. No. 06-207-T |
| AMALGAMATED TRANSIT UNION, DIVISION 618, Defendant. | ) | |

**FIRST STUDENT, INC.'S REPLY MEMORANDUM**

First Student, Inc. herewith replies to the Union's memorandum i) in opposition to First Student's motion to vacate the arbitration award and ii) in support of its motion to confirm the award.

**I. The Arbitrator Exceeded His Powers By Adding An Additional Limitation On First Student's Ability To Test Its Drivers**

The central dispute in this case concerns the arbitrator's application of an "intent to drive" limitation on First Student's ability to subject its drivers to alcohol testing. The parties agreed in the CBA that the arbitrator could interpret that document, but they forbade him from adding or modifying it:

> The power of the arbitrator shall be limited to the interpretation of the Agreement. He shall have no power to add or subtract from or modify any of this Agreement . . .

Complaint, Exh. A, p. 8.

First Student contends that, by imposing an "intent to drive" limitation on the company's ability to test, the arbitrator added to, or modified, the CBA – something he was not permitted to

do. The Union contends that the arbitrator's use of an "intent to drive" limitation merely reflected his interpretation of the CBA – something he was permitted to do.[1]

The arbitrator's imposition of the "intent to drive" limitation did not merely interpret the contract. It added to and modified it. Several facts lead to this conclusion.

First, the concept of an "intent to drive" is utterly foreign to the CBA. The words "intent to drive" do not appear in the document, either in the context of drug testing or in any other context. This indicates that the arbitrator was importing a new concept into the contract, not merely interpreting it.

Second, the CBA contains a merger clause. Exh. A, p. 14. This means that the parties "intended the writing to be the complete and exclusive agreement between them." Regensburger v. China Adoption Consultants, Ltd., 138 F.3d 1201, 1206 (7th Cir. 1998). Since the CBA does not contain an "intent to drive" limitation, but does contain a merger clause, it is clear that the parties never intended to include such a limitation.

Third, an arbitrator is only permitted to interpret contract terms which are vague or ambiguous. Hotels Condado Beach, Etc. v. Union De Tronquistas Local 901, 763 F.2d 34, 41 (1st Cir. 1985) ("[A]lthough [the arbitrator] may construe ambiguous contract language, he is without authority to disregard or modify plan and unambiguous provisions.") (emphasis added, citation omitted); Anheuser-Busch, Inc. v. Beer, Soft Drink Etc., 280 F.3d 1133, 1142 (7th Cir. 2002) ("In this case, the contract was clear and unambiguous and needed no interpretation. Accordingly, we are convinced that the arbitrator, not the parties, modified the contract and thereby exceeded his authority.") Here, as the Union concedes, the arbitrator's introduction of the "intent to drive" concept arose from his purported interpretation of the phrase "scheduled or

[1] "The Arbitrator is specifically vested by the clear terms of the CBA to interpret the contract...[H]e made the common sense interpretation that the language "scheduled or assigned," must incorporate some kind of an "intent to drive." Union Mem. at 15.

assigned to perform work." Union Mem. at 15. But there is nothing ambiguous about this phrase. It is clear and simple. On any given day, employees are either scheduled or assigned to perform work, or they are not. Because the phrase "scheduled or assigned to perform work" was not ambiguous, it did not require interpretation, and the arbitrator's purported effort to do so was improper. Cf. NIPSCO v. United Steelworkers of Am., 243 F.3d 345, 347 (7th Cir. 2001) ("the arbitrator cannot dress his policy desires up in contract interpretation clothing.").

Finally, like the arbitrator whose award was reviewed in Anheuser-Busch, Inc., the arbitrator here "failed to offer any justification for how his decision was derived from the language of the contract..." 280 F.3d at 1141, n.4. Apart from two completely conclusory statements,[2] the arbitrator's only attempt at explaining his creation of the "intent to drive" limitation was the following:

> An employee who had bid on a route, and who is therefore normally expected to complete that route, but who has not reported for work at all that day, is not "scheduled or assigned to perform work" as that phrase is used in Article 22.

Award at 15.

The basis for this statement – that a driver who does not appear for work on a scheduled work day therefore is no longer scheduled to work that day – is a mystery. This disjointed reasoning fails to explain how the arbitrator's "intent to drive" concept derives from the language of the CBA.

The foregoing discussion illustrates that the arbitrator was not engaging in mere contract interpretation when he hatched the "intent to drive" requirement. He was adding to and modifying the contract in accordance with his own notions of industrial justice. Both the CBA

---

[2] "Since Sanville never intended to drive on December 1, she was no 'scheduled or assign,' as that phrase is used in Article 22." Award at 17. "Given that the rationale of the drug and alcohol testing program is to ensure that drivers not operate vehicles in an impaired condition, it makes sense that employees not be subject to testing on a day they are not driving a vehicle." Award. at 15.



PRV_879976_1/MPOGUE

and established judicial precedent prohibited him from doing so. As a result, the arbitrator exceeded his powers, and the Award is invalid.

**II. The Union's "Common Sense" Argument Is Baseless**

The Union asserts that the "intent to drive" limitation is required by "common sense." Union Mem. at 8. But "common sense" is not the test of whether the arbitrator exceeded his powers; the words of the CBA are. As shown above, the CBA simply does not support the creation of this additional limitation on testing.

Moreover, "common sense" dictates that the "intent to drive" limitation would be unworkable. Assume that a driver arrives at work, appears inebriated, and tests positive for alcohol. Under the "intent to drive" rule, the driver could invalidate the test merely by claiming (either before or after the test) that she did not intend to drive that day, but had come to work simply to see a colleague, pick up her pay check, or for some other reason. The words "I didn't intend to drive" would frustrate employer's ability to discipline impaired employees.

To avoid the vagaries of results required by "common sense," the parties agreed to a much clearer regime: the company can test whenever the employee is scheduled or assigned to drive. The Union itself admits that Sanville was scheduled to drive on the day she was tested. Union Mem. at 3. First Student's test was therefore proper.

**III. The Federal Regulations Are Consistent With The CBA**

In its opening brief, First Student demonstrated that the award is also defective because the arbitrator disregarded federal regulations governing alcohol testing. Those regulations require alcohol testing, if reasonable suspicion exists, "just before the driver is to perform safety-sensitive functions." 49 C.F.R. §382.307. That is what First Student did.

In its opposition papers, the Union argues that the regulations only permit testing when a driver is “about to” drive a bus. Union Mem. at 14. It argues that, because Sanville did not intend to drive on the day in question, she was not “about to” drive, and therefore could not be tested. Id.

This argument fails because the regulatory term “is to perform” does not mean, as the Union implicitly suggests, “about to drive.” The locution “is to perform” means the same thing as the CBA’s term “scheduled or assigned to perform.” Both phrases mean that, in advance, an employee has been designated or scheduled to perform at a certain time. In contrast, the phrase “is to perform” does not mean “about to drive,” as the Union maintains. For example, a driver who oversleeps on a scheduled work day, as Sanville did, still “is to perform” that day (in the regulation's words) and still is “scheduled or assigned to perform” that day (in the CBA's words), even though she is not “about to drive” (the Union's words).

Since the federal regulations are completely consistent with the CBA, the arbitrator erred in manifestly disregarding these regulations.

**IV. The Award Violated Public Policy**

First Student demonstrated that the arbitrator’s reinstatement award violated two public policies: the policy against drunk driving, and the policy that bus drivers be safe operators.

The Union resists this argument by pointing out that Sanville’s blood alcohol level exceeded .04, the federal limit, but not did exceed .08, the state limit. Union Mem. at 20. The Union also notes that “no one is handing the keys to an impaired bus driver as a result of the reinstatement.” Id. at 21. According to the Union, this means that the reinstating Sanville would not violate any public policy. Id.

Given the extensive legislation in Rhode Island concerning the safe operation of busses and ensuring that bus drivers are safe operators, it strains credulity to suggest that Rhode Island's public policy would not be offended by reinstating a bus driver who, like Sanville, registered a .064 blood alcohol level at work on a scheduled work day. Moreover, there is also federal policy to consider. The applicable regulations make it clear that federal policy is to prohibit even persons registering .04 from driving school busses. Reinstating Sanville would clearly run afoul of that imperative.

Finally, the fact that the reinstatement order does not literally "hand the keys to an impaired bus driver" is beside the point. There is of course no evidence that Sanville would be impaired were she ever to drive a bus again. But the policy of Rhode Island and the federal government is to ensure that bus drivers are safe operators. Reinstating Sanville would offend that policy.

## Conclusion

For the foregoing reasons, the award should be vacated.

FIRST STUDENT, INC.

By its Attorneys,

/s/ Mark A. Pogue
Mark A. Pogue (#3441)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
401-274-9200
401-276-6611 Telecopy

**Certificate of Service**

I hereby certify that on the 27th day of April, 2007 a true copy of the foregoing First Student, Inc.'s Reply Memorandum was served upon counsel of record listed below through the ECF system.

Carly B. Iafrate, Esq.
129 Dyer Street
Providence, RI 02903

Gerard P. Cobleigh, Esq.
70 Jefferson Boulevard
Warwick, RI 02888

/s/ Mark A. Pogue



PRV_879976_1/MPOGUE